In the Supreme Court of Georgia

Decided:   July 8, 2016

S15G1207.  THE STATE v. ASHLEY.

NAHMIAS, Justice.

In 2012, Thad Lee Ashley was convicted of kidnapping a seven-year-old girl, attempting to kidnap her three-year-old sister, and criminal trespass at the trailer park where his father lived.  At trial, the jury heard evidence of these crimes as well as evidence of three earlier incidents at the trailer park's pool when Ashley had behaved inappropriately towards young children.  The trial court admitted the evidence of these other incidents as similar transaction evidence under Georgia's old Evidence Code, which applied at the time of Ashley's trial, for the purpose of showing his intent when he engaged in the acts alleged in the indictment and his desires towards young children.

Ashley appealed, contending among other things that the trial court abused its discretion when it admitted the similar transaction evidence.  In a 4-3 decision, the Court of Appeals agreed and reversed Ashley's convictions on that

ground. See Ashley v. State, 331 Ga. App. 794, 794 (771 SE2d 462) (2015). This Court granted the State's petition for certiorari to consider whether the Court of Appeals erred in that respect. We conclude that it did, so we reverse that portion of the Court of Appeals' judgment and remand the case with direction to consider Ashley's other challenges to his convictions.

1. (a) Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On July 3, 2011, Ashley, who was then 37 years old, was served with a criminal trespass warning prohibiting him from returning to the trailer park in Douglas County where his father lived. Despite the warning, Ashley continued to live with his father, who had a forest green minivan.

Two months later, on Sunday, September 4, 2011, a woman who lived in the trailer park on a different street than Ashley's father was preparing to take her four daughters, ages seven and under, and her infant nephew to church in her maroon minivan. The woman was on her front porch, locking the door while holding one of the girls, and seven-year-old K.L. was sitting on the floor of the minivan with the sliding door on the driver's side open after helping her three-year-old sister B.L. and the other children into their seats. Ashley walked up to

the minivan, reached inside, grabbed K.L. by the wrist, pulled her out of the minivan, and began dragging her up the street as she screamed and tried to get away. K.L. managed to break free from Ashley and ran to her mother, shaking and crying. The woman yelled at Ashley and saw him "touching himself" as he reached into her minivan a second time and tried to grab B.L., who scrambled away from him. The woman threatened to call the police, and Ashley walked off in the direction of his father's trailer, claiming that he had been confused. Ashley told his father, "I think I just did something wrong." His father asked him what he meant, and Ashley said, "I tried to get them kids out of that van," which he claimed he mistook for his father's minivan.

A sheriff's deputy responded to the scene and spoke with K.L., her mother, and the property manager's brother before talking to Ashley at his father's trailer. Ashley claimed that he knew one of the girls in the minivan and thought the children were in his father's minivan. Ashley denied touching any of the children, claiming instead that he merely got into the minivan with them and sat in the driver's seat. Ashley also claimed that he did not drink or use drugs. The deputy arrested Ashley for criminal trespass.

Later that day and in the days following, Ashley gave three videotaped

3

interviews after waiving his <u>Miranda</u> rights. In the first interview, he claimed that he saw a woman driving what he thought was his father's minivan. He said there were several children in the minivan and that he sat in the minivan and chatted and played with them. He also said that when he was getting ready to leave, a little girl stepped out of the minivan, and he grabbed her by the arm to keep her from falling.

In the second interview, Ashley denied getting into the minivan and said that he had "absolutely not" touched any of the children. He acknowledged that the minivan that the children were in and his father's minivan were different colors, that he was not color-blind, and that his father's minivan did not have a specific braided trim that the minivan that the children were in had.

In the final interview, Ashley said that he was a former heroin addict but had not used heroin in the previous nine months. He claimed that on the morning of the minivan incident, which was a Sunday, he had gone to a methadone clinic. (The methadone clinic actually was not open on Sundays.) Ashley said that he took four Xanax pills in addition to the methadone and claimed that as a result, he could not remember anything at all about the incident with the children in the minivan. However, later in the interview, he said that

he remembered seeing some children in the minivan whom he recognized from the pool or from seeing them on the street and that he remembered the girls' mother yelling at him from the porch and saying that she had called the police. Ashley also claimed that he then waited there for law enforcement to arrive.

(b)     On October 28, 2011, Ashley was indicted for the kidnapping of K.L., the attempted kidnapping of B.L., entering an automobile with intent to commit a felony, and criminal trespass after receiving notice that entry onto the trailer park property was forbidden. On June 1, 2012, the State filed a notice of intent to present similar transaction evidence regarding three incidents involving Ashley at the trailer park pool during the summer of 2011: (1) an occasion when the assistant property manager and another woman saw Ashley staring inappropriately at young girls ranging in age from five to ten years old; (2) Ashley's repeated touching of a ten-year-old girl on her torso just below her breasts when the girl's mother went inside for a few minutes to use the restroom[1]; and (3) an incident when the police were called after the assistant property manager and other adults saw Ashley repeatedly squirting a five-year-

---

[1] At trial, this girl testified that the touching made her sick to her stomach and that she told Ashley to stop or she would hit him.

old boy with a powerful water gun so hard at close range that the boy was crying and had red marks on his skin. It was these incidents that led the trailer park to seek the trespass notice against Ashley.

Ashley's trial started on June 11, 2012, and thus was conducted under Georgia's old Evidence Code.[2] At a hearing before opening statements, the trial court ruled that evidence of the three pool incidents was admissible as similar transaction evidence.[3] The court found that the evidence was being offered for the proper purpose of showing Ashley's intent during the physical acts alleged in the indictment and his desires directed towards young children, noting that Ashley made his intent an issue by claiming in his interviews with law enforcement and his arguments to the court that what happened on September 4, 2011, was a mistake or accident and that he was on drugs and thought that the minivan with the children in it was his father's minivan. The court also found that the State proffered enough evidence for the jury to conclude that the

---

[2] Our new Evidence Code applies to any motion made or hearing or trial commenced on or after January 1, 2013. See Ga. L. 2011, p. 99, § 101.

[3] See former OCGA § 24-2-2 ("The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct."). Under the new Evidence Code, the admission of "[e]vidence of other crimes, wrongs, or acts" is governed by OCGA § 24-4-404 (b). See Humphrey v. Williams, 295 Ga. 536, 539 n.2 (761 SE2d 297) (2014).

6

incidents at the pool occurred. Finally, the court found that the pool incidents, which involved young children in the same trailer park just a few months before September 2011, were sufficiently similar to the crimes charged that proof of those incidents tended to prove the charges against Ashley.[4]

At trial, Ashley testified on direct examination that he only vaguely remembered the minivan incident, because when he had left his father's trailer a few minutes before, he "knew [he] was intoxicated, more so than [he] had ever been." Ashley repeatedly testified that he did not remember getting in the minivan or touching the children and that he would have remembered it if he had done so. He also claimed that he did not remember saying the things that he told the investigating officers during the three recorded interviews, which had been played for the jury. But Ashley also testified specifically on direct and cross-examination about where he was going before the incident, the route he

---

[4] Under the old Evidence Code, when offering similar transaction evidence, the State had the burden to show that: (1) it sought to introduce the evidence "not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) "there [was] sufficient evidence to establish that the accused committed the independent offense or act"; and (3) "there [was] a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter." Williams v. State, 261 Ga. 640, 642 & n.3 (409 SE2d 649) (1991). Before admitting such evidence, the trial court was required to make findings on the record as to these three issues. See id. at 642 n.3.

took, the weather at the time, thinking that the maroon minivan with the children in it was his father's van rather than the same maroon minivan that he had seen around the trailer park before, the scared look on the mother's face when she was yelling at him, the moment he noticed the color of the van and realized that it was not his father's van, his emotional response to this realization, what he said to the girls' mother, what K.L. was saying to her mother, and how quickly K.L. calmed down. He also claimed to remember pointing towards his father's trailer to let the mother know where he would be when law enforcement arrived. On cross-examination, Ashley asserted that the reason that he was barred from the trailer park was because he upset the assistant property manager, who then orchestrated all the complaints about his behavior at the pool. Ashley said that as far as he was concerned, he had "not really offended anybody, except for the little girls in the van, probably."

On June 14, 2012, the jury, which had been given instructions on the charged offenses and on simple battery and simple assault as lesser included offenses of kidnapping and attempted kidnapping, respectively, found Ashley guilty of all the charged crimes. Four days later, the trial court sentenced Ashley to serve life in prison for kidnapping, 30 consecutive years for attempted

8

kidnapping, and 12 concurrent months for criminal trespass; the court merged the count of entering an automobile with intent to commit a felony. On February 14, 2014, the trial court denied Ashley's motion for new trial.

(c) Ashley appealed, and the Court of Appeals reversed his convictions in a divided decision. Division 1 of the court's opinion unanimously rejected Ashley's challenges to the sufficiency of the evidence supporting his convictions, including his claim that there was insufficient evidence to prove that he had the criminal intent to kidnap either girl. See Ashley, 331 Ga. App. at 794-797. In Division 2, four judges held that the trial court abused its discretion in admitting the evidence of the pool incidents as similar transaction evidence and that the error was not harmless, so Ashley's convictions had to be reversed. See id. at 797-800.[5] Division 3 said that it was unnecessary to address Ashley's other claims of error in light of the rulings in Division 2. Three judges dissented, explaining that they believed that the trial

[5] In its order denying Ashley's motion for new trial, the trial court ruled that the evidence of the pool incidents was also admissible as directly relevant to the criminal trespass charge, because it explained why Ashley had been banned from the trailer park and rebutted his explanation for the trespass notice. The Court of Appeals majority ruled that the evidence was not admissible as part of the res gestae of the kidnapping and attempted kidnapping charges – without mentioning the criminal trespass charge. See Ashley, 331 Ga. App. at 799. Because we hold that the trial court did not commit reversible error as a matter of similar transaction law, we need not address the res gestae issue.

9

court acted within its discretion in admitting the evidence of Ashley's behavior towards children at the pool as similar transaction evidence under the old Evidence Code. See id. at 800-801 (Ray, J., dissenting).

We granted certiorari to review the Court of Appeals' holding in Division 2. The case was orally argued on January 19, 2016.

2. In applying the test for determining the admissibility of similar transaction evidence under the old Evidence Code, see footnote 4 above, the decisive question was often, as in this case, whether the State showed that there was a "'sufficient connection or similarity between the independent offenses or acts and the crime charged so proof of the former tends to prove the latter.'" Pareja v. State, 286 Ga. 117, 119 (686 SE2d 232) (2009) (citation omitted). In this analysis, the proper focus was "on the similarities, not the differences, between the separate act and the crimes in question." Johnson v. State, 289 Ga. 22, 24 (709 SE2d 217) (2011). The independent act did not need to mirror every detail of a charged crime, but instead might reflect only a portion of the acts that established one or more of the charges being tried. See, e.g., Alatise v. State, 291 Ga. 428, 431 (728 SE2d 592) (2012) (citing Oliver v. State, 276 Ga. 665 (581 SE2d 538) (2003), a robbery and murder case in which this Court

10

upheld the admission of evidence concerning the defendant's entry by key into the apartments of women other than the victim around the same time as the crimes charged, ostensibly for maintenance purposes, because there were no signs of forcible entry into the victim's apartment); Chua v. State, 289 Ga. 220, 232 (710 SE2d 540) (2011) (same). Moreover, a lesser degree of similarity was required to admit evidence of independent acts to show motive or intent than to admit such evidence to prove identity. See Smith v. State, 273 Ga. 356, 357 (541 SE2d 362) (2001). On appeal, the trial court's decision to admit similar transaction evidence would be upheld unless it was an abuse of discretion. See Whitehead v. State, 287 Ga. 242, 249 (695 SE2d 255) (2010).

(a) The Court of Appeals majority opinion correctly recited general principles governing the admission of similar transaction evidence under the old Evidence Code, but then seemed to confuse criminal intent with a completed crime. The majority opinion acknowledged that "a similar transaction need not be a crime," citing this Court's decision in Chua, but then asserted without citation that "the fact that a person engaged in non-criminal behavior does not evince criminal intent." Ashley, 331 Ga. App. at 798. The majority opinion also jumped from the premise that the State "has not argued

11

that Ashley's behavior in the earlier incidents was criminal" to the conclusion that the State "sought to use acts in which Ashley *lacked* criminal intent to prove that he had criminal intent in another instance." Id. (emphasis in original). After discussing cases decided by this Court under the new Evidence Code and the Eleventh Circuit under the Federal Rules of Evidence, the majority opinion concluded that "[t]his case . . . involves instances where Ashley had different mental states – lacking criminal intent on the one hand and allegedly possessing criminal intent on the other hand." Id.

Intent, however, exists apart from the act that makes it a crime. See OCGA § 16-2-1 (a) (defining a "crime" as "a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence").[6] See also Henderson v. Hames, 287 Ga. 534, 538 (697 SE2d 798) (2010) (noting that the commission of a crime requires the joint operation of an actus reus and a mens rea). Depending on what the non-criminal behavior is, it might well evince an intent that, if coupled with different acts, would constitute a crime.

---

[6] Criminal negligence is defined as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

12

It also is not clear why the Court of Appeals majority focused on whether the State had argued that the similar transactions were "criminal." As the majority opinion had just observed, it was well established under the old Evidence Code that similar transaction evidence was not limited to a defendant's previous illegal conduct. See, e.g., Alatise, 291 Ga. at 431; Chua, 289 Ga. at 232; Phagan v. State, 268 Ga. 272, 279 (486 SE2d 876) (1997). See also Davis v. State, 269 Ga. 276, 278 (496 SE2d 699) (1998) ("It is the similarity of the facts of the defendant's prior conduct to the facts of the case being tried that is the critical element of this type of evidence, not the adjudication of any charges which might have been brought as a result of the earlier conduct.").

The fact that the State did not file criminal charges against Ashley based directly on the pool incidents – although those incidents did lead to his criminal trespass warning, the violation of which resulted in his trespass conviction – does not mean that his behavior in those incidents was non-criminal or that it was not indicative of his state of mind. Indeed, two of the allegedly similar transactions – repeatedly touching a ten-year-old girl against her wishes and to the point it made her sick to her stomach, and repeatedly shooting a five-year-old boy with a water gun to the point that he was crying and had red marks on

13

his skin – at least arguably constituted simple battery. See OCGA § 16-5-23 (a) ("A person commits the offense of simple battery when he or she either: (1) Intentionally makes physical contact of an insulting or provoking nature with the person of another; or (2) Intentionally causes physical harm to another."); Meja v. State, 232 Ga. App. 548, 549 (502 SE2d 484) (1998) ("For simple battery, mere pain is sufficient to show physical harm.").

(b) So under a proper understanding of criminal intent, was the evidence of the three prior pool incidents – all of which occurred in the same trailer park in the same summer as the crimes charged – admissible as similar transaction evidence under the old Evidence Code? Ashley was charged with, among other things, the kidnapping and attempted kidnapping of two young girls. A person commits kidnapping when he "abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will," OCGA § 16-5-40 (a), and a person commits criminal attempt when, "with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime," OCGA § 16-4-1. Two of the allegedly similar transactions involved Ashley's making physical contact with young children in an offensive manner that they indicated

14

to him was unwanted – one child by saying that she would punch him if he did not stop, and the other by crying – much like K.L. and B.L., who were screaming and trying to get away from Ashley. Moreover, Ashley put his intent during the minivan incident squarely at issue by claiming that he mistakenly believed that the minivan was his father's, did not intend K.L. and B.L. any harm, and did not engage or try to engage in any unwanted touching or moving of them. Indeed, he pursued his no-intent claim on appeal. See Ashley, 331 Ga. App. at 796. Thus, those two pool incidents were probative on the issue of Ashley's intent.

(c)     The other incident at the pool – Ashley's leering at young girls to the point that it made adults uncomfortable – is less clearly probative of his intent with regard to the charged crimes. However, that incident was evidence of Ashley's motive or "bent of mind" in grabbing K.L. and grabbing for B.L. – "touching himself" during the process – and motive and bent of mind were proper non-character purposes for admitting similar transaction evidence under the old Evidence Code. In the words of the case law interpreting the old Code, this incident was evidence of Ashley's lustful disposition toward young girls like K.L. and B.L., which would give him a motive to kidnap them. See, e.g.,

15

Phagan, 268 Ga. at 279 (noting that the behavior showing lustful disposition could itself be legal, such as the legal possession of pornographic movies depicting conduct linked to the charged crimes); Caldwell v. State, 263 Ga. 560, 564-565 (436 SE2d 488) (1993) (same).[7]  Motive evidence was especially important in this case due to Ashley's insistence that he was simply high during the minivan incident and had no improper motive.

The trial court referred to this evidence as showing Ashley's desires toward young children – the language of motive or bent of mind – but admitted it under the label of "intent," even though none of the crimes charged required proof of a sexual intent.  Because this evidence could have been admitted as to issues other than intent, and because of the other compelling evidence of Ashley's guilt, including his own contradictory statements and testimony, we see no reversible error in the trial court's admission of the evidence that Ashley had leered at young girls shortly before he tried to kidnap two young girls in the

---

[7] "Lustful disposition" was often associated with "bent of mind," the murky mixture of state of mind evidence, potentially encompassing motive and intent and perhaps more, that Georgia courts long held was a proper non-character purpose for admitting evidence of independent acts.  See, e.g., Caldwell, 263 Ga. at 564-565.  "Bent of mind" is not part of the new Evidence Code.  See Olds v. State, Case No. S15G1610, 2016 WL 2946361, at *3 n.6 (May 23, 2016) (explaining that the new Evidence Code "does not authorize the admission of evidence of other acts to show 'bent of mind' or 'course of conduct'" (citation omitted)).

same neighborhood. See Matthews v. State, 294 Ga. 50, 54 (751 SE2d 78) (2013) (finding no reversible error where the trial court properly admitted similar transaction evidence under the old Evidence Code that the State offered for the purposes of showing the defendant's intent, course of conduct, and common scheme or plan, even though the court instructed the jury that it could also consider the evidence for the purpose of showing the perpetrator's identity). See also Peoples v. State, 295 Ga. 44, 55 (757 SE2d 646) (2014) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.").

3.      We therefore conclude that under the old Evidence Code and the cases interpreting it, the trial court acted within its discretion in admitting the evidence of Ashley's conduct at the pool involving the ten-year-old girl and the five-year-old boy as proof of his intent when he grabbed K.L. and tried to grab B.L. – particularly in view of Ashley's protestations, both before and at trial, that he acted with innocent or even helpful intent. See Oliver, 276 Ga. at 667; Murray v. State, 293 Ga. App. 516, 520-522 (667 SE2d 382) (2008) (upholding the admission of evidence that the defendant tried to coax and then tried to pull an 18-year-old woman into his apartment complex pool, allegedly committing

17

a simple battery on her, at the defendant's trial for aggravated assault with intent to rape and other crimes committed against his 15-year-old stepdaughter).  We also conclude that even if the evidence of Ashley's leering at young girls at the pool was not properly admitted on the issue of intent, the trial court could have properly admitted it for other purposes and the other evidence of Ashley's guilt was strong, so any error was harmless.

Rather than engaging in a straightforward analysis of similar transaction evidence under the old Evidence Code and the copious case law interpreting it, the Court of Appeals majority looked for "persuasive" guidance to the new Evidence Code and cases interpreting the new Code and the Federal Rules of Evidence, Ashley, 331 Ga. App. at 798, which may account in part for how the majority went astray and was a principal criticism of its opinion by the dissenting judges, see id. at 800 (Ray, J., dissenting).  At the least, the majority opinion's reliance on those sources unnecessarily complicated its analysis.  In many a case, the result may be the same whether an issue is analyzed under our old or new Evidence Code, but as we have recently emphasized to lawyers, if that is so, it is "happenstance, at least without careful comparison of the old and new law." Davis v. State, Case No. S16A0103, 2016 WL 3145125, at *9 & n.9

18

(decided June 6, 2016). Where there is ample authority available on an issue under the applicable Evidence Code, there is no need to look elsewhere. And so it should be clear that we render no opinion on how this case would be decided under the new Evidence Code.

For these reasons, we reverse the Court of Appeals' judgment as to Division 2 of the majority opinion, and we remand the case for consideration of the other enumerations raised by Ashley.

Judgment reversed in part, and case remanded with direction. All the Justices concur.